## Singer's Estate.

*Contract—Sale—Unconscionable bargain—Inadequate price.*

A sale of an interest in a decedent's estate payable at a future time, and having a prospective value of $5,000, for the sum of $500, will be upheld, although the bargain is unconscionable and the price grossly inadequate, where there is no evidence that the seller was subjected to constraint, or that any fraud or misrepresentation was practiced upon him.

Argued Jan. 16, 1907. Appeal, No. 218, Jan. T., 1906, by Sarah C. Hackett and Mary K. Gunkle, from decree of O. C. Phila. Co., sustaining exceptions to readjudication in Estate of Severin Singer, deceased. Before MITCHELL, C. J., FELL, BROWN, MESTREZAT, POTTER, ELKIN and STEWART, JJ. Affirmed.

Exceptions to readjudication.

ASHMAN, J., filed the following opinion:

The exceptions relate to the award of the share in his father's estate of John Singer, a son, to Sarah C. Hackett, an alleged purchaser of his interest. The share amounted to about $8,000, against which a mortgage for $3,000 had been given by the son, leaving a net value of $5,000, for which the claimant paid $500. The testator's will directed an accumulation of the income of his estate until the arrival at full age of his youngest child, at which time his estate should be equally divided among his children, six in number. John Singer, the son, secured a loan on mortgage of $1,000, and according to his testimony afterwards applied to George E. Hackett for an additional loan of $3,000. He sought this aid of Hackett, who appears to have effected a loan for his brother, in consequence of written offers from Hackett to loan money upon his share, or to purchase it outright. The first communication was dated April 22, 1903, and read as follows: "Mr. John Singer, Dear Sir: Any time you might desire to secure an additional loan or sell your estate interest I would be pleased to have you call and see me." The note inclosed the card of the writer, headed, "Loans, Real Estate, Investments, etc., 635 Walnut St." Singer called upon Hackett, but was put off, and he finally effected the loan through a building association and satisfied the prior mortgage of $1,000. In November, 1903, Singer asked Hackett if he would secure a loan of $1,000, to which Hackett replied that the share was not worth that sum, because it was not payable for nine years. He finally declared that his wife would loan $500, and this offer was accepted by Singer, who thereupon, with his wife, signed and acknowledged certain papers, which he supposed were evidence of a loan. This was the narrative in brief of the transaction as told by Singer

and corroborated by his wife. Both admitted the execution of the assignment, the deed and the transfer of the building association stock, and Singer also admitted that the papers had been submitted to him for examination, but declared that he had only glanced over them, believing them to be simply evidences of a loan.

The claimant, however, produced a postal card in the handwriting of Singer which was flatly contradictory of the theory of a loan. It was dated November 5, 1903, and read: "Dear Sir: My interest in my father's estate is for sale. I will sell it for $1,000 cash, subject to the $3,000 mortgage. If you wish to buy it let me know as soon as possible, as another party has bid that amount and I will give you the first chance. Yours respectfully, John Singer." Hackett testified that in answer he offered to purchase at $500, which reply the son denied receiving. His letter dated November 26, was thereupon produced, saying: "I will take your offer of $500, but I must have the money before next Wednesday." This correspondence is open to one construction only. If there is any ambiguity it is removed by the after conduct of the son. He paid no dues to the building association and no interest on his mortgage to the association for $3,000, which were no longer necessary, if he had parted with his title. We do not hesitate to say that the bargain on the part of the buyer was unconscionable because the price was grossly inadequate. But this, if the bargain was not brought about by fraud, affords no ground for setting the sale aside: Whelen v. Phillips, 151 Pa. 312; Robbins's Est., 199 Pa. 500. Was there fraud on the part of the purchaser or her agent? None certainly is visible on the face of the transaction. The son makes a distinct offer in writing to sell his share in the estate; he signs and acknowledges the assignment and the deed to the purchaser, and transfers to her the stock in the building association, from which he had procured a mortgage, and he admits that ample opportunity was given for scrutinizing the papers, and he ceases from the date of the transaction to pay the dues and interest to the association which as owner of the mortgaged share he was obliged to pay.

Was there fraud which arose out of the relations of the parties? The agent of the seller was the agent of the buyer—

a relationship which is common enough among real estate brokers, and provocative enough of fraudulent practices; but the purchaser here was the wife of the agent, and from their community of interests, a commission paid by the wife practically came from the pocket of the agent. The judicial decision that the trust created by the will was invalid, and that the children's interest vested at testator's death was not rendered until after the dealings between the parties had closed. If the claimant had prior thereto been advised by counsel as to the nature of the testamentary trust, and had continued to assure the son that the interest was uncertain, his concealment of the information might have vitiated the bargain; but it was not shown that he had been so advised, and besides, the expediency of securing legal advice must have been as apparent to the seller as to the buyer, and the means of obtaining it were as open to one as to the other.

In Bennet v. Bennet, 43 L. T. (N. S.) 246, Sir George Jessel said, "there is no reason why a man should not be a fool." As a corollary to that saying, it may be added that there is no reason why a court should protect a fool against the result of his folly. No new feature of rapacity in the buyer is apparent in this instance to make him a worse offender against the law of fair dealing than an army of Shylocks who have preceded him. The patriarch Jacob bought a large landed estate from an improvident brother for the price of a frugal breakfast, and the common parent when appealed to upheld the bargain. A "catching bargain" much later in date than that between Jacob and Esau was passed upon in Davidson v. Little, 22 Pa. 245, when the owner of land worth $8,000 conveyed his interest for $200. The court held that the transaction was suggestive of fraud, but that the contract was binding if the vendor was of full age, of sound mind, acquainted with the necessary facts and subjected to no mental imprisonment.

The exceptions to the readjudication are sustained, and the award made by the original adjudication is reinstated.

*Error assigned* was the decree of the court.

*J. Albert Miller*, with him *Thomas A. Fahy*, for appellant.

*Robert S. Bright*, for appellee, was not heard.

PER CURIAM, April 1, 1907:

The learned court below found that while the bargain was unconscionable because of the gross inadequacy of the price yet it was not fraudulent, and, therefore, could not be set aside.

The decree is affirmed on the opinion of the court below.